We have four arguments this morning, and we will begin with number 232153, Colibri Heart Valve against Medtronic. Have you pronounced that already? Well, certainly for Medtronic, I can't speak for Colibri. After all this time, you still can't speak for that? Pronunciation? Good morning, Your Honors, and may it please the Court. This nine-figure judgment in this case should be reversed because the 294 patent cannot be molded into what Colibri wants it to be. In my limited time today, I want to draw out three particular points from the briefing. First, the 294 patent cannot claim priority to, and thus is anticipated by, the Paniagua application from 2004 because the inventors did not possess a method for deploying a valve whose leaflets are made up of separate pieces of material. And separately, because the two inventive components required by Cordis are not present here. Second, there is no evidence in this record of Medtronic's subjective intent to induce doctors to infringe the 294 patent, by equivalence, by instructing them to retract the sheath. Nor could there have been such evidence of intent to infringe under this late-arriving theory because of prosecution history estoppel and vitiation. And finally, if I have some time remaining and the Court needs to reach the issue of damages, I'll address why the District Court abused its discretion by allowing Dr. Velturo to base his proposed reasonable royalty on a wildly inapposite global agreement between the only practicing competitors of this market and by adopting an unapportioned auction value theory based on mere capability to practice the claimed method, which violated this Court's decisions in Niazzi and AstraZeneca and allowed Colibri to capture 100% of a $3.6 billion royalty base when the allegedly patented method was used only 30 to 40% of the time. When you started by saying you were going to talk about three, I expected actually some sifting among the issues, and it seemed to me you'd just cover maybe not every one of them, but almost every one by combining them. Well, I think we'll cover the waterfront, but I think we can address them in fairly short order. Can I just ask one?  This is an expired patent, right? It is. So if you were to win in getting JMO on non-infringement, invalidity needn't be addressed. Is that the relationship? I'm sorry, I didn't hear the last part of the question. Invalidity need not be addressed? If we get JMO of infringement, I believe invalidity of non-infringement. Thank you. Invalidity need not be addressed, and I think the converse would also be true. But let me start very quickly with the anticipation issue. Can I ask a question about that? So Calibri argues that a reasonable fact finder could find that these method claims are not limited to implanting a particular kind of valve, and I want to know what specifically you think there is in the specification that would make it so no reasonable fact finder could say that the method is limited, would include something that's not what I'm referring to as an origami valve. Sure, and that's the term that I use as well as an English major. First of all, of course, written description, four corners, it's an objective evaluation. But like specifically, like line and column. So paragraph 47 in the Paniagua application is where I take you, because I think that may be the single best of several examples. And let me take you in particular to, since we're looking at the Paniagua application as the reference here, I'll take you to the specific page, which is... Is this identical? It is identical. Can you just talk about the columns? Sure. It's very hard to keep turning. I totally get that, and that's why I've marked up my patent, the 294 patent, with the same number. So we're at 156, column 8. This is the paragraph beginning, the cusp or leaflet portion 220 of the valve means 200. Okay, and line 44. That's where it stops, yes. But what you'll see is later on, this is a very long paragraph relative to some of the other paragraphs here. What you will see is two parts of this that are important, which the first part of this is the cusp or leaflet portion 220 of the valve means 200 is formed by folding of the pericardium material used to create the valve. So there you have right there, Judge Stoll, the valve is formed by folding. Then you go on to the leaflet forming portion is a single continuous uncut layer. That's at lines 55 and 56. A single continuous uncut layer. Let me just clarify that I totally get that there is a valve that's disclosed here that has to be not sutured. The question is whether the method is a separate embodiment or not, right? And whether when the method is disclosed, a person of ordinary skill in the art would understand it to be saying, the only thing that could be claimed with this method is claiming using this method on an origami valve. The valve that you just described at column 8. To me, that's the biggest factual question. And you've got to show that no reasonable fact finder could conclude. So I think I can do that. And here's how I'm going to do that. Because there's another part, first of all, of paragraph 47 that's very important here. And that's over on column 9. Although a preferred embodiment of the invention, this is at line 5678, I believe we're starting. Although a preferred embodiment of the invention comprises a single piece of valve material folded to create the valve body, and a leaflet forming portion that has no cuts or sutures, the inventors have discovered that as long as the leaflet portion of the valve itself is formed from a single piece of biocompatible valve material, the other portions of the valve can be formed by suturing. So you can have the skirt sutured. But the valve itself, the leaflets, have to be unitary. They have to be, and the specification. Well, sure, that's talking about the valve. But let me ask you a hypothetical. Suppose that, and this is the way I kind of look at this patent, but that the main focus of this is the single piece valve versus the sewn valve. And that's what they talk about completely throughout. But there's references in the patent to a method of using that valve that is also novel. Why can't, even though all of their references talk about using that new method, and hypothetical, so just grant me that there is a new method in here, can't there be two different inventions? Even if the thrust of the patent is the new valve they've discovered, if in this discovery they've also described a new method for using that valve, and it turns out that that method is valve agnostic and can be used with prior art valves, why can't they claim both of those? So, of course, I resist the assumption, but I'm going to embrace it for purposes of your hypothetical. I resist the assumption that the method of installation here is novel. It was copied verbatim from Besler. Well, that's an obvious next challenge. Well, no, but whatever you think the words are, but I'm accepting your hypothetical. So here's why. Because the claims still require a valve, and a valve of two to four leaflets. Where do the claims say they require a valve of two to four leaflets? The claim language, if you look at claim one, and it's at the top of column 14, the valve, and this is line three, the valve including two to four individual leaflets made of fixed pericardial tissue. Do you see that? Yeah. Okay, so the invention still requires a valve, so the question is did the- necessarily require the single piece valve. That's right, because that's the crux of our argument, is that that can't be supported as a priority. You're not answering my hypothetical. I'm trying to. Yeah, but you're not answering it. Okay, let me- Why, if the method described that's at issue here, even if it wasn't the main focus of the patent, if it was described and it's novel, why can't they get that as a claim? Because the method- Because, first of all, the method requires a valve, and the valve- Counselor. I'm sorry. I'm going to help you for a minute. Please. What in the specification tells you that the valve in the method is the valve that's an origami valve? Is there anything? Like, for example, it does say, system of the replacement part valve of the present invention at column 11, lines 40 through 41. That might be good evidence for you. I mean, like, so is there something else like that? That is. You also have the description of figure 8, which appears at column 6, where they say that figure 8 depicts the implantation delivery system used with the present invention, and the present invention is described everywhere here. So you're saying when it uses that- When you're saying that it uses that word valve in the claims, which seems broad enough to cover what it's covering in the infringement case, that it actually just meant the valve, the new valve, is specified in the patent. Well, I'm saying that either that or there's a break in the chain of priority, because like in Tronzo, the Paniagua application 2004 not only didn't disclose multi-leaflet valves, but actually disclaimed. Why don't you ask for a claim construction on valve to confine it to this invention? In hindsight, as a trial lawyer, I would have loved to have done that, but as a practical matter, as this court's case is saying- Let me ask you this. If we don't agree that the valve, that 2-to-4, because I think the 2-to-4 stuff still infringes- your product still infringes under the 2-to-4 if it's not confined to the origami, right? Otherwise, we wouldn't be here at all. Right. We're not asking for a limit in construction. Right. So if the 2-to-4 is broad enough to cover the 2-to-4 sutures, and you agree now, I think, for purposes of this appeal, that your device has 2-to-4, it's just not what you think is the origami one. Well, that's absolutely right, but that's the whole point. Well, that's the whole point for me, too. If the method is separate, and they invented a novel method of delivering this in addition to inventing a novel valve, why isn't there written descriptions for that? If the method could be separated from the valve, then I could grant you your hypothetical and say they could claim it, because that would then be the facts, of course. Is that a fact question? In this case, it's not. You don't think it's a fact question whether the method could be separated from the valve? It ultimately resolved to a question of law because no reasonable juror could find out. So why is it that no reasonable juror could separate the method from the valve? And where I was trying to go with Judge Hughes, and I think this is the ultimate answer, and actually, Judge Hughes, it's your opinion for the court and Ulf Bamberg that helps understand this. In the Paniagua application, in the common specification, my friends disclosed, absolutely, a sutured multi-part valve, but they didn't possess it. And that's the touchstone for written description. They didn't possess it, and that breaks the chain. Can I just add my two cents here? It seemed to me coming in on this issue that what you would have to find, and maybe you could find, but is something in, I guess, what you call paragraph 57 through 59, that tied the installation method to a particular valve. I actually think there's material in there that you can work with, but I haven't heard anything about that. Well, I'm sorry. I thought I agreed with Judge Stoll when she pointed out the language at the top of paragraph 58 where it says the delivery and implantation system of the replacement heart valve of the present invention, and that takes us to the oral document. And you also seemed a moment ago to concede. I guess I'll use that word. You'll tell me why I've misunderstood that, that if the installation method can be used with, let's say, non-novel valves, then there's written description. I didn't concede that. I'm already into my rebuttal time. Don't worry about time. There's a lot to talk about here. No, I didn't concede that with regard to this patent. I was trying to answer Judge Hughes's hypothetical, but his hypothetical was assuming a very different patent than the one we have here because that valve of the present invention that's described in that first line, and by the way, that's the only language that Caligari added to Bessler in those two paragraphs, 57 and 58, to describe the installation method. That's the only thing they added. They linked it to the valve of the present invention. And every reference to the valve of the present invention in 2004 is the origami valve. And this was my point when I was bringing up the Bamberg case with Judge Hughes before, which is that there's a difference between disclosing something. Tronso disclosed the cups that were disclaimed, but it wasn't possessed. And these inventors didn't possess. I guess I just want to raise a usage issue, which is in Ariadne. Ariadne uses two different formulations. This possession notion, which has a long history, whose meaning, shall I say, is not self-evident. The alternative formulation, which in your brief you favor, which partly I think because it has somewhat greater intuitive, immediately apparent intuitive content, is that the words of the written description have to make clear to an ordinary skilled artisan that the writers of the written description thought they invented a particular thing. It could be wrong, because prior art might prove them wrong, but it indicates in its own terms that they thought they invented it, and that your position on paragraphs 57 through 59 is that this cannot reasonably be read to convey that. The other side had some testimony about how this is a separate invention. Did the testimony say you can tell it's a separate invention from the words of the spec, or just it is a separate invention that can be used with, to put it too crudely, It's closer to the latter, but it's actually neither of those. If you look very carefully at what Dr. Dossey said, he said there are two separate ideas. Invention is mostly a lawyer's construct used to stitch together his testimony. He talks about there being two ideas, and he's very careful to use the notion of ideas. Did he say that this second idea, it would be apparent to anybody, not only is being described in such a way as to make clear it can be used independently of the new valve? I'm looking at the language of Dr. Dossey's testimony on this point, which in the appendix starts at 22273. You'll see at the bottom of that he talks about there being two fundamental ideas in that patent application. One is the idea of repositionability and recapturability, and two is the idea of folding leaflets out of a single sheath. So there were two independent ideas, that's what he says. He is then asked, how do you know that there were two independent ideas in that application? His answer is, there are figures and text describing both of those ideas. Now, he then puts up on the screen figure 8 from the 2002 application, and he says that's describing that first idea that I discussed. Then he goes on to say that it has the same two ideas as the 2002 application because the specification is identical. Then he goes on to say, I want to take a look, this is now 22275. He's asked, I want to take a look at the claims to see what they say about the valve. And he says, the valve, what you're looking at here is claim language from the 294 patent application. So now he moves over to the 294 patent and talks about two to four individual leaflets. And then what he said at appendix 22280 is that the folded method, or the folded origami valve, enables the practice of that method. So you'll see that at 1388 is the transcript page and 22280 is the transcript. I think we'll probably hear some more about this from Mr. Lampkin, but I don't want to end your portion of the argument. Can you talk about prosecution history, Estavol? Yes. And maybe briefly say why in your pretrial memo, when you abandoned the Fifth Affirmative Defense, that didn't end the issue. Sure. So the abandonment language, by the way, is prescribed by the California local rule. Right. Whose consequences there are what you would think they would be. Right. But if you take a look at what was actually said under that heading with regard to- In the pretrial memo, not the trial memo. Let's see. Just to make sure we're looking, because there's two documents. Let me make sure that I've got it here as well. 13659. So 13659. And then you tried to walk it back in the trial memo. I wouldn't say that we tried to walk it back, because if you take a look at the 13659 under the heading Abandonment of Issues, Medtronic says Medtronic is not pursuing the Fifth Affirmative Defense of prosecution history, Estavol. And in the full context of what's said here, this needs to be understood as we're not going to pursue this at trial, because it doesn't have anything to do with- Even though the local rule is clear about this required statement about abandoning of issues. Defenses and claims, I think, is the language. Well, I think, again, with regard to what trial counsel did here, you will note also at page 13637 Medtronic's statement that its inclusion of the contentions below, and this is lines 11 through 14, does not constitute a waiver or concession of any aspect of Medtronic's objections or arguments made in connection with those orders, nor does it constitute a waiver of Medtronic's right to appeal. Can I ask you something else?  What is the document at page A18581? That's the Medtronic's trial brief. So this was like- This was subsequent. This is much more clear that you're preserving the issues- Right. For purposes of trial. Right. So what was this time-wise? This is about a year after this initial paper with the abandonment language, right? So was this something that was pre-trial or after trial? So the contentions were January 3rd, 2022. The trial brief was almost over a full year later, January 24th, 2023. I'm trying to figure out if you somehow, even if you did abandon it earlier, did you somehow resurrect it with this January 23 paper? So help me out. Well, we certainly did because we put everybody on notice that prosecution history estoppel was alive. What is the timing of this January 23 document with respect to trial? Was it before trial? It's before trial. Okay, thank you. And then there is further, our Rule 50A motion. And our Rule 50A motion, which is in the record at page appendix 18727- Right, you made the point in your 50A and 50B. The other side had a single sentence that didn't call attention to any kind of waiver in the 50A response. Do you have case law that says, and they did make the waiver argument in their 50B opposition. Do you have case law that says that the opponent of a 50B motion must have preserved a particular ground of opposing the same point when opposing 50A? In the- It's true on the movement side, right? You don't get to make 50B grounds for moving for J-Mal that you didn't present at 50A, but on the opponent's side? In the Ninth Circuit, there is a doctrine known as waiver of waiver. We've cited a case to that effect in our brief. Not just the Ninth Circuit. In response to that. But I don't think there is that parallelism because that 50A preservation requirement, Judge Toronto, is compelled by the Seventh Amendment. There is not, I don't think, a similar Seventh Amendment requirement regarding the response to that. But what we have here is a very clear case that under the Ninth Circuit case law would be a waiver of waiver by failing to raise it in the 50A. And ultimately, the district court was presented with this waiver argument, didn't find it waived, ruled on it on the merits. Can you talk about the merits of preservation? Let me do that in as short order as I can. Let me ask the court to take a look at page appendix 21293. This is Dr. Gallegos' testimony. And remember, by the way, that when Calibri is putting on its case in chief, it is putting on, at this point, still both a literal case as well as a doctrine of equivalence case. And so this is its effort to try to make its equivalence case. And this is Calibri asking its expert. And what is this telling you about whether the difference between, and here we have a clear statement of what the equivalence theory is, retracting the sheath to expose the replacement heart valve device, that's what Medtronic does, or moving it out with a pusher member, whether the difference between those two things is substantial. His answer is there is no substantial difference. Now compare that language to Claim 39. Can I just ask? I'm always a little reluctant to read complete agreement with every bit of a formulation where the formulation is only the question with a simple answer. I believe, correct me if I'm wrong, that at least elsewhere, the framing of the affirmative theory of equivalence was not retraction alone, but retraction of the sheath while pushing, basically, the stent inside, which you more or less have to do. Right, it's holding the inner members. Well, you can talk later about, there's a separate issue related about whether pushing is holding. You're holding it from one side, holding it so that it doesn't move back or something. That may or may not be pushing, but I thought that their point about prosecution history, Estoppel, I think is this. Claim 39 was read by the examiner to mean retracting the sheath alone without any pushing. Their theory of equivalence is pushing plus retraction. Those are not opposites, and also, we didn't give up anything more than, even if we gave up that, the retraction alone. There is an effort in their brief, in the red brief in this case, to put a lot of their literal infringement evidence into support for their equivalence case. Again, keep in mind that this court demands particularized evidence. Let me take you to Dr. Gallegos' testimony three pages later from the portion I was just showing you. This is a legal issue, though, right? Sorry? This is a legal issue. This is a legal issue. This is absolutely a legal issue, but I just want to make sure that we understand what the theory is that they were asserting. That is, again, you took as true in your application of the doctrine of equivalence framework Medtronic's position that the pusher member does not move. Is that right? Setting that aside for a minute, you might still have an argument on doctrine of equivalence, even with the retraction plus the pushing to keep in place. What is your legal argument on that? Our legal argument is that in claim 39, claim 39, the examiner said, you don't have written description support for retraction, partial retraction. The only thing you have in your spec is a paragraph talking about retraction, complete retraction. Sure, and regardless of whether that was right or wrong, in response, those claims were abandoned, perhaps to pursue them in a future application, right? Exactly. So your view is that any kind of retraction is abandoned? It doesn't matter if there's retraction and pushing? There is. What is your position? That is our position, that they have abandoned retraction here because, and we've cited cases both to the district court and to this court, energy transportation, J&M versus Harley-Davidson, Pacific Coast Marine windshield, mycogen plant science, all of these cases involving different circumstances. Some of them withdrawals of claims because of prior art. What is your view on why, in your view, it doesn't matter that there's retraction plus pushing when claim 39 just said retraction? Because they surrendered all partial deployment via retraction. That claim would have covered every kind of partial deployment by retraction. They decided to cancel it. They deprived the patent office of being able to examine it, and effectively you could, I mean, this is one where you could pick from a menu of options. You could have even said they dedicated that to the public. But it also demonstrates, by the way, why what we have here is a case of opposites, why we have a vitiation here. Because what their equivalence theory, even Judge Stoll, if it ends up being the more retraction plus pushing, what their equivalence theory ends up being is, and again, Dr. Gallegos at 21295 lays out this part of their equivalence theory. Actually, this is their theory that, yes, this is their equivalence theory. He's asked a question, and whether you are only moving the sheath or only pushing up the pusher member, or let's say, does that create, under either of those approaches, is there a creation of opposing force between the pusher and the movable sheath? Answer, yes, both of these achieve the same element of force required to result in a portion of the valve exiting the movable sheath. So despite the fact that they claimed, very specifically, one kind of force, pushing the pusher member out, something our device can't possibly do, they claimed that specific force, but then claimed by equivalence any kind of force. They basically said, we claim Newton's third law of motion, and they can't do that. I want to ask you to speak very briefly on one aspect of damages, not the non-comparability aspect, but tell me why Hanson, with the snowmaking machines, doesn't allow the form of measuring the royalty that was done here. Sure. As I said in my opening remarks, Niazi, I think, answers this question very clearly. But Hanson, to your particular point, Judge Toronto, Hanson involved, I think, three or four snowmaking machines. Every single one of them was used at some point or another to infringe the method. The argument... The point of that section of Hanson was that there were several years in which at least one, maybe even several of the machines, were not used at all, and the claim at issue was a method of using. So there would not have been infringement during those years with those machines. Nevertheless, the damages theory for the plaintiff was approved that the royalty would be paid on capacity for each year for each machine. And that's because every... And again, I come back to my distinction here. In our devices, every single one of those devices is used only once. They're not reused, not the installation device, and certainly not the stent. Is that agreed here? Once it comes out of the package, either it goes and stays in or it comes out and is disposed? Right. That's my understanding of the record. That's my understanding of the technology. And it's just, once it's sold... I'm not sure why that makes a difference in distinguishing Hanson. And I think that is the difference in distinguishing Hanson, because in every one of the snow machines, the argument, and I quote page 1080 of Hanson, the argument was that they shouldn't have paid as much in a royalty in the Georgia-Pacific negotiation because, quote, it acquired the machines for experimental purposes and did not use them much. And you can take that into account in the negotiation, but here it wasn't taken into account at all because we have an agreement that 60% to 70% of these devices were never used. How did that figure come... That comes directly from the testimony of Caligari's witnesses. Okay, but that's not disputed. So here one could chop down the damages figure to 30% to 40% of what the current figure is. I think we asked for either a new trial or perhaps a remittiture. I'm not sure if we did that or not. In the district court, I'm honestly at a loss to remember that at this moment. But with regard to that, I thank the court for its indulgence and I hope I'll have a few minutes to come back. You will. Thank you. Thank you. Thank you, and may it please the court. I thought I would begin by answering Judge Toronto's question about whether the inventors or the specification has to indicate that the inventors recognized that this second invention, the method, is itself inventive. By using, for example, the present invention or not using the present invention with respect to the other invention, in this case, the folded leaflets. And the answer to that question is no. The hallmark of written description is disclosure, mental possession. It's not whether or not you say it's the invention or use the present, this invention, to describe it. And actually, to require someone to say this invention when describing the second invention or to require them to recognize it as an invention would be completely contrary to ordinary continuation practice. As this court's pointed out, in continuation practice, one of the purposes, when you file an initial application and, quote, later realize that the specification discloses a second or broader invention, you can go back and add claims to claim it and you get the benefit of the priority day under 120. And that's Antares Pharmaceutical v. Medec Pharma, 771 F. 3rd at 1358. But that's if... So at least this is the way I'm thinking about it. So that would be true, and as far as I know, has always been true in the continuation practice, where an outside, relevant reader looks at the words and sees that those words actually teach an independent invention. Let's just call it that. Which is not the same thing as saying, Oh, it turns out you could use them separately even though the words don't teach you. And so what I'm very focused on is the language, particularly the language that opens paragraph 57, as you've called it, down column 10 line, was it 57 or something, 56. Which seems, and even the rest of that paragraph seems always to be talking about the inventive valve being part of what's being talked about in the implementation method. Certainly because we're describing what it says preferred embodiments, it's ordinary to say, Oh, when you're using this implementation method to pair it with the valve. But there's nothing in there that a skilled artisan will look at and say, Aha, this valve is somehow linked or related or limited. And you have to use that valve for the implementation method. And in fact, Dr. Dawson testified and pointed, and we'll start with figure 8 in particular, which is agnostic as to any type of valve. And he pointed out that he said that you could look at page 149 of the appendix. That shows... What about figure 8? Does she say it's agnostic about the type of valve? It doesn't have any indication as to a valve whatsoever. All it is is the insertion device and it has the arrow to the left, up and down. So you're saying when I'm looking at figure 8 itself, is there anything in the specification that causes you to say that figure 8 is agnostic about the type of valve? I don't think there's anything in particular that says that. But Dr. Dawson pointed out that a skilled artisan, and this is all from the perspective of a skilled artisan, a skilled artisan would understand, quote, that figure 8 is clearly illustrating that first idea, the separate idea of recapture and reposition. Is that because of the arrow? The arrow is, yes, that you can push it out and pull it back, push it out and pull back. There's simply no indication that somehow or another the type of valve limits that. Let me talk about my concern. My concern a little on this, and it's a hard question because you definitely have a good, you're on the better side as far as, you know, this is a substantial evidence question, right, whether a reasonable person could find what this discloses. But I keep on thinking about public notice and all of the language in this portion of the application or specification that talks about the present invention, as Judge Toronto has pointed out. There's multiple places where it says, you know, in discussing the procedure for implantation, the procedure for implantation of the replacement heart valve device of the present invention. It says of the present invention at least three, four times. And then on top of that, this specification is obviously very clear when it talks about the valve, that the valve is a very special one, that, you know, there's no doubt that it criticizes valves that are sutured. And so, you know, is there something special about the combination of the valves that are sutured, emphasis saying the other kinds that are sutured, there are failures, they've got big problems, so we're going to have our origami valve, combined with in describing this method four times at least, there's the method for implanting a valve of the present invention. Why wouldn't a person of ordinary skill in the art think, hey, these people are just claiming the narrow valve? So certainly when you look at that, they definitely have the idea that you could use these things together. And when you're talking about the preferred embodiments, of course they're going to have the two inventions together. But just like Cordis, just like Revolution Eyewear, in those cases they only disclosed the invention, the two separate inventions together. That was all the disclosure. But because they addressed different problems and they addressed it through different techniques, it was permissible to claim them separately. And that's exactly like the case here, because as Dr. Dossi explained, someone looking at just Figure 8 would understand that's clearly illustrating the first idea, separate idea, separate problem, repositionability, about the ability to recapture and reposition the heart valve device. Again, page 22,274, Figure 8, again, that's spreading the idea of recapitable, repositional devices. Just a minute. Wouldn't somebody looking at Figure 8 read the sentence at, I guess in paragraph 58, which is column 11, the opening sentence starting at line 40 that specifically describes Figure 8 as involving delivery and implementation system of the replacement artificial heart valve of the present invention? Yes, certainly that would say that you could use it for the present invention. But it wouldn't necessarily limit it, because a skilled artist looking at that, this is very much like Cordis. There's simply nothing in the patent that says the separate problem of how you get it to the right exact spot is somehow informed by which type of valve you're using. They're completely separate questions and separate problems. Can I ask you a hypothetical? Let's assume, I agree with you, that there's two separate inventions here, the new valve and a new method. But what if it was clear from the specification that the inventor thought that the reason the new method would work was because of the new valve, but then later discovered the method, well, I don't know if later discovered is the correct word because that might get us into priority problems, later realized that the specification also supported using that method with different valves? Right, and I think the answer is you always take the perspective of the skilled artist in reading the specification, and so even if the inventor later said, oh my gosh, I just re-read my specification and that's completely separate, that would be fine. And I think that Dr. Dossey here testified to that. Okay, but let me, I gave you a two-part question. I really wanted to answer the first one first. I apologize. No, it's my fault for asking a bad hypothetical. If the only way to read the specification is that even if they're two separate things, they're linked, that the invention of this new valve is what enabled the new method, and that's the only way you could read that, then would you agree that you might have a problem here? I know that's not the way you read it, but if it was, if they were kind of dependent upon each other... If the specification made clear that there's some characteristic or feature of that valve that means that you need to use that valve for this new method, then there would be a good argument that they don't have mental possession of the broader invention. But Dr. Dossey testified on page 22275, to practice the idea of repositioning and recapturing, you do not have to use the folded valves. You can use any technique to assemble the leaflets into the heart valve. And there's simply no evidence they're different sizes, they're different anything about this. That's a good point. My question is related to that, which is simply that did your expert say at some point, look, I read this specification, given the nature of the technology at issue here, given the nature of the technology at issue here, I think that it's, you know, clear that a person of ordinary skill in the art would understand that this method would work with any kind of valve. Did he say that? He didn't say that in those terms, but he did say it in terms, especially when talking about figure 8. When he talked about figure 8, he said it is clear, which means a skilled artisan looking at this would understand that this does not depend on any particular valve. And this is, in that sense, just like Cordis, or just like Revolution Eyewear, Your Honor, because in Cordis itself, for example, the one party disclosed ring stents with undulating longitudinal sections, and the patent only disclosed ring stents, not non-ring stents, and it actually taught away from non-ring stents, because it teaches away from using ring stents, or stents that are not made of rings, and that's because they are weaker. But the court held that the written description was sufficient for just the undulating longitudinal sections with non-ring stents, and I quote, "'Cause nothing in the patent suggests that the benefits of undulating longitudinal sections are tied in any way to ring stents. Likewise here, nothing suggests that the benefits of the recapture and reposition is tied in any way to the type of valve. Second, Cordis's expert testified without contradiction that the undulating structures disclosed in the patent could be used in conjunction with non-ring stents. Likewise here, Dr. Dossi made clear that practicing the idea of the reposition and recapturing, you don't have to use folded valves. And finally, the last sentence, although the embodiment in Cordis would lack the strength-enhancing characteristics of the ring stents, the undulating longitudinal structure would still enhance the stents' flexibility. Likewise here, if you practice the inventions without the folded valve, you might not have that durability after placement, but you would still get the benefit of repositioning and recapturing, which is the critical piece that adds the value to every surgery in this case. Apart from figure 8 in your expert's testimony, are there other places in the specification that support, that have written description for this recapturing method? So, the recapturing method is actually specifically disclosed. And where they say, there's about 8 paragraphs that talk about, you have 2 paragraphs talking about the folded valve, and then there's 8 paragraphs talking about the procedure for inserting it. And then in that it says that you can hold it, and then you'll recapture it. And so it specifically talks about that. And at no point in that description of the process, hold still, and then recapture it, if you've repositioned, does it say, oh, and it's the folded valve that makes this possible. There's just simply nothing that says that. Can I ask you something about the doctrine of equivalence? In the embodiment that was previously claimed in Application Claim 39, is there a stabilizing or pushing force necessarily on the valve at the time of retraction? So, if one assumes that you have friction because the catheter is expanding, the stent is expanding inside the crimson, you would need actually some sort of a stabilizing force to counteract it, otherwise the whole thing will loop together. But that's not actually how that works. In order to have... When you say that works, what do you mean by that works? How prosecution history estoppel works. In order to have a prosecution history estoppel across independent claims, it's an infectious estoppel, the rule is that you have to have a word that's in common, where you're just claiming one and that affects the meaning of the other. That's the general rule. And there's a reason for that. A patent prosecutor is looking at this and saying, I want to drop Claim 39, I don't want to pursue it, would have a lot of reason to do that. And he can't figure out, or she can't figure out, what the effect will be if you're going to look past the actual words to inherency. I don't even know how you do that in the abstract when you're not talking about science, you're just talking about the words that claim. The words we're talking about right now are retraction combined with recapture. Right? And the claim is pushing combined with recapture, right? And so your view is you can't I mean, I understand your Dr. McCliver theory to be that it would retract and also push to, so I don't understand what you're talking about with the I don't understand your argument about changing the words. I just don't appreciate that. Okay, so Claim 39 had the words retractional and Claim 34, which became Claim 1, has only pushing. And so the fact that we do not pursue Claim 39 shows that we didn't want to do retraction only. And one of the reasons you would not want to do retraction only is you know you're going to capture whatever you need to capture in your claim because you always have pushing. This technique requires a pushing out and as long as the surgeon is pushing out to cause the stent and the valve and the pusher member to be exposed, then you're covered by Claim 34. It's not enough that you gave up all retraction. You know, I agree with you. There was definitely an argument made that no, we have written description support for retracting and recapturing. But there was a strategic decision made to pursue it later. Well, the strategic decision was as long as we have pushing, we're good enough. And there's nothing about Where do I see that? Pardon? Where do I see that? So long as we have pushing I think when you're looking at prosecution history estoppel, like what was given up, you have to look at the words of the claim that was given up. What was given up was retraction only without a pushing element. And what was kept was pushing, where it's agnostic as to whether or not you combine it with retraction. But just to go back to I think Judge Stoll's opening question on this, your position is that even if there's retracting, everybody would know that there has to be pushing. Pushing in the very sense that you that you have used for your Where you have that friction, you would ordinarily for retraction also need to have something that holds it stable or otherwise provides a contrary force. And if a skilled artisan would know that reading Claim 39 and then see that Claim 39 was dropped, hasn't there just been a surrender of retraction parenthesis with the unavoidably necessary pushing? I think what it tells the reader is that we don't need retraction alone because there is a separate claim that has a separate type of pushing. I guess one way to make the point is no skilled artisan would read 39 as retraction alone. Because it wouldn't work, right? If you have the radiating force and the skilled artisan is thinking you have the radiating force as opposed to something that's not got that friction. That might be the case. But that type of inherency isn't the type of thing that one does for prosecuting schistory estoppel because Blacks are Welcome says a clear rule. Claims that do not recite the amended term are not subject to estoppel. And that's because skilled artisans patent prosecutors need to be able to know if I drop this claim, what are the consequences? And inherency oh there's pushing force inherent in that isn't the type of thing they're going to necessarily know. It would be a complete and total world of hurt for patent prosecutors if every time they drop a claim they have to go back and say is there something in that claim that's inherent that might be part of another claim that's not specifically listed that I'm going to be giving up. And that's just simply not how it works. And you have to go around Blacks are Welcome and its rule to go have an infectious estoppel where there's no terms in common whatsoever. If I could turn for a moment then to damages perhaps which is the basic rule on damages is in Hansen there were multiple factors that pointed to the fact that there would be a I think you will tell me would you agree that at least Hansen is a real outlier case? No Your Honor Lucent itself points out that when you have But Lucent didn't involve Lucent had a bunch of really important treatise like language that explained how things can work. But in terms of cases that actually say yes it is okay to have a royalty measure that meters according to some non-infringing activity. Hansen I mean I can't tell me if there's more than Hansen. I think Hansen is the lead case and Lucent cites Hansen when it has that additional language about fire alarms. And I think there's three features of it that show you why it makes a perfect sense to apply that type of an option value here as opposed to a per use type of license. And the first is that it's an insurance function that you need to have it there if it happens. Just like the snow. Having insurance is not an infringing activity. I mean I get the idea but you got to tie it to infringing activity. I also get why if there are practical reasons that it's fundamentally going to be impossible to distinguish to make the more refined judgment. And I think Hansen did make a point of saying the negotiation expert, the licensing expert there said this is that situation. But you have a case in which I gather you agree that you may not be able to tell operation by operation but you know 60 to 70 percent are not infringing. And you don't know in advance whether or not you're going to need that capacity. So what? So the surgeon can't decide I want the one with the capacity, I want to buy it in advance or in the middle of the operation call up and say suddenly I need this. And our expert actually testified specifically about the hypothetical negotiation. He's asked would they have only agreed to a royalty for those 30 to 40 percent of the procedures that involve recapturing and repositioning? Answer, no. Why not? Answer, well there are two reasons. First, how would you do that? You're going to have to track how every device is used. So it's exactly like Hansen because Hansen had the problem that you didn't know how often it was going to be used because no one kept track of the snowfall when it was used. Likewise here, how would you know? Well how did you come to your 30 to 40 percent? That was the experience of the expert witness. Right, so the experts are sitting with the negotiators in the hypothetical negotiation and why can't they basically come to some sort of negotiated agreement about how many of these devices are going to be used in an infringing way and how many not? And we're going to build that into the percentage. Exactly what you would expect. They would take into account and then, Dr. Veltura explained this, you take into account how often it's used and what are the consequences if you don't have it available. Did they have that knowledge at the time of the hypothetical negotiation, that is at the time the infringement began? Yeah, they may or may not have understood that at the time of the infringing, when the infringing began, but I'm going to speculate that they had, you know, let's give them the benefit of the doubt. Does it matter that your invention could only be claimed as a method? I mean there are times when there's a claim, you could craft a claim that's a product, you could claim here, I can't envision a way that you could recite a claim covering what you've got here without having it invented. I think that does matter and there's one other thing I wanted to point to and that is that having the ability, having the right to use the method, which is what is being sold here, actually affects each surgery that's done whether the method's used or not and Dr. Fish testified about this and he explained that when the surgeon knows that he can recover or she can recover recapture and reposition you can get better, you can go right for the critical zone, the optimum zone, even though that's close to what he called the danger zone because you know if you hit the danger zone you can pull it back and that before this prior art existed, before this existed in the prior art, this is page 21096 for the record before this existed, surgeons would stay further away and use a non-optimal positioning because they didn't have the ability to, if finally if I could circle back to one thing on doctrinal equivalence and the evidence here and that is the evidence shows unmistakably, we have the pictures, we have testimony from the only two witnesses who performed these procedures who described the Medtronic video that when this is performed there's not merely the retraction of the sheath, but the pushing force has the effect of moving the stent, moving the valve, moving the pusher member out and into the body and once you have that, it pushes it out forward into the body, if you hold the one thing that everybody agrees is still the pigtail catheter, it moves out into the body. Dr. Gallegos testified that yes in every surgery that I have it moves out, it actually moves forward, the pushing actually changes the position It moves forward with respect to an external frame of reference With respect to an external frame of reference but it also necessarily moves forward with respect to the retracting sheath because if it didn't move with respect to the retracting sheath then it wouldn't get exposed so it's moving both forward in the external frame of reference with respect to the pigtail catheter the body, the anatomy and with respect to the sheath. Do I remember right that I guess it must be the red brief says that what those pictures show is the entire catheter apparatus moving forward does that matter to your point or do you dispute that? It matters because if you're just doing insertion, moving everything the sheath, everything is moving along that's the insertion, that's not partial retraction but the testimony is and this is from Dr. Fish that the sheath moves up during that operation. He talks about the sheath marker band starting relative to the pigtail about the middle and it ends up above that. So the sheath has moved back while the rest of it has moved down and forward and then Dr. Gallegos specifically testified that it isn't the whole thing moving when he is asked, Dr. Gallegos the entire device is moving forward he responds, I didn't say the entire device moved downward, I told you the pusher member moves downward. You asked me about the cone and he goes and says those move forward Can you try to explain this and the question is not going to be well formulated but Mr. Casanias said standing there and his brief also says that there's some impossibility that you're overlooking. Can you both identify what that argument is in as generous a way as you can manage and then explain why it's wrong? I think the argument is because the handle that you turn in order to cause retraction is attached to the pusher member that you for some reason it's impossible to move the pusher member with respect to the sheath and I just truthfully I don't understand how that could be true and I think the pictures tell you that it's not true. Because if you just look at the slides for example if you look at even their slides that would be page 1,9433 Say that number again please 1,900 1,900 19,482 and 19,453 If you look at 1,9433 in their pictures if you take a look, now these are not lined up right because These are the pictures that are in the briefs Yes, these are in the briefs, but these are bigger so it's easier. If you take a look they've marked the marker band the marker band's on the sheath and the marker band starts at the top of the pigtail catheter on the left, we're talking about 1,9453 and then on the right the marker band is way up above the pigtail catheter so it's moved back relative to the pigtail catheter. And then if you line them up, you flip the page and we're at 1,9482 and this is ours, where we've lined up the pigtail catheter, you can actually see the nose cone has gone down and you can actually see that the stent has moved down so things are moving relative within the patient downward and with respect to the sheath which has moved backward. And when you look at the discussion of the video, the only people who testified what's happening in the video were two doctors who actually performed the procedure and both of them described the stent and the valve and the nose cone moving down and the sheath moving backwards. Just so I understand, is it your view that that's icing on the cake for you, not necessary? I think it makes it an easy case because when you're trying to have forward motion with respect to an external frame of reference. I think that's exactly right. When you're looking for pushing out, how does that thing move out? It moves out because it's the pushing of the doctor that moves it out and both Dr. Agayios and Dr. Fish said, in every single procedure that we do, we see that downward and out movement and that is in every procedure. In fact, Medtronic's own director tell them, start above and why do they say start above? They start above because they know it's going to move down and the record is very clear on that. Finally, in terms of the alignment, this is a jury question, which frame is aligned with what? Did the fluoroscope move and things like that? In terms of alignment, I think you can tell that the pictures that are presented by my brother are not properly aligned for two reasons. Just even apart from everybody agrees that the pigtail catheter doesn't move. If you look to the left under the word spindle, you can see a little line there that's part of anatomy. If you look to the right, it's moved up. If you look at the little curly thing, which is your guide wire, that's the only thing that looks like a pigtail so it's confusing, but if you look on the left, this is something that winds to the right. It's at one point and then if you look on the right, it's moved up. That winds through your anatomy. It winds through your body. Unless it's tearing through heart flesh, they've just simply misaligned these two items. If there's no other questions, I'd be happy to give up what doesn't remain of my time. Thank you, Your Honor. I'll try to be very brief, Your Honor. First, with regard to the anticipation point. My friend suggested that nothing in the specs suggests that the method is tied to the type of the valve. That's wrong. I've pointed the court to the description of Figure 8, which appears in Column 6, Lines 41 and 42. That says that Figure 8 depicts the implantation slash delivery system used with the present invention in a preferred embodiment. But it doesn't say it can only be used with the present invention. No, but it's telling us what's possessed.  the court has heard me talk about, and you talked about with my friend, the language in the middle of Column 11 where the procedure is described as the delivery and implantation system of the replacement artificial heart valve of the present invention. That's linking the process of installation of implantation to the present invention, which is the valve. In fact, the 294 patent uses the term the replacement heart valve device of the present invention five times in just the portion dealing with the implantation method. And finally, if you had any doubt about this, Dr. Fish's testimony about his light bulb moment. You want to talk about possession? You want to talk about mental possession? Dr. Fish's light bulb moment in Appendix 21068 and 09 was when he saw the origami valve. That was what was going to make it small enough to go into the catheter for implantation. Yeah, but then while the light was on, he saw something else that he had. We don't have any objective evidence of that. We don't have any objective evidence of that. That is strictly lawyer argument and the specification and objective reading. And is it your view that as a result, Kingstown, I guess, is the usual case that's  used. I'm sorry, which case? Kingstown. Sure. That for ten years, these inventors and their lawyers didn't realize that there was an independent invention and I think the other, Kingstown may suggest, and I think the other side says, it's just not significant. That fact that there was a ten year gap before. I think if you have to have possession in the 2004 Paniagua application, it's highly relevant to priority. Let me turn to Doctrine of Equivalence very quickly. As I said before, and I think I may not have gotten this out entirely, pushing was never their equivalence theory at trial. Their equivalence theory, and this is 21296, assumed that the pusher member does not move. And as a factual matter, Judge Taranto, at page 14 of our we have the citations there that show why it is indeed impossible. The valve... I was not able to follow it. Well, let me see if I can explain it and I realize that you've already been very indulgent and the red light is coming on as I say this. But, imagine a pipe or a drinking straw and imagine that there is a wire that runs through it and the valve is on the wire. But the valve is compressed inside the straw and the valve is also mounted to the wire that's in the middle. It's mounted to it. The wire itself does not push anything forward. The straw pulls back and what happens is, and the only movement that's shown in those stills there is the natural blossoming of the stent as the retraction takes place. There is no pushing of anything. But again, keep in mind that in the very, very slender equivalence theory that they presented at trial, it was based on the presumption that the pusher member does not move. We're now hearing a theory that it's the pusher member does move. And, that's why this court does require particularized evidence with regard to this. Finally, before I just touch on the damages point very quickly, the overarching, all is the fact that this is an inducement only case. An inducement requires specific intent, specific subjective intent to infringe. I know you started your argument wanting to talk about that and you didn't get a chance, but that means they didn't get a chance to respond to that. I'm doing nothing more than reminding the court that that was a point that I made at the beginning and that overlies all of the infringement arguments here. And then finally, with regard to my friend's point about the damages, Judge Taranto, you're exactly right. Insurance is not an infringing activity. And you know what? We see patent claims all the time that are claimed in terms of capability. Capability is not in this claim. I will note, by the way, that if you look at their expert's testimony on equivalence, his conclusion is that the device is capable of performing the alleged equivalent. It's not actually performing the alleged equivalent. And finally, just again, keep in mind that, and this is very important for purposes of You can't have that many finalists. Of Niazi. It's all on the damages point. With regard to Niazi, these are method claims and method claims only. They're only infringed by practicing the method. Thank you. Thanks to all counsel. Case is submitted.